IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2013

**STATE OF TENNESSEE v. ERIC DATES**

**Appeal from the Criminal Court for Shelby County**
**No. 09-07729     Lee V. Coffee, Judge**

**No. W2012-01030-CCA-R3-CD  - Filed September 6, 2013**

The Defendant, Eric Dates, was convicted by a Shelby County Criminal Court jury of driving under the influence (DUI), a Class A misdemeanor, and was sentenced to eleven months, twenty-nine days, all suspended but 48 hours. *See* T.C.A. 55-10-401 (2012).  On appeal, he contends that (1) the traffic stop was an unconstitutional search and seizure, (2) the evidence was insufficient to support his DUI conviction, and (3) the verdicts were inconsistent.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, PJ., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Michael E. Scholl, Memphis, Tennessee, for the appellant, Eric Dates.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Michael R. McCusker, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

At the trial, Memphis Police Officer William Teal testified that on March 7, 2009, around 1:30 a.m., he saw a Jaguar drive through a red light.  He attempted a stop, but the driver did not comply.  He said that during the pursuit, the car entered the lane of oncoming traffic and traveled around sixty-five miles per hour in an area with a speed limit of forty-five miles per hour.  He said the car began to do "doughnuts" between the lanes of traffic.  He said that he could not chase the car unless the driver had been involved in a violent felony and that running a red light was not a violent felony.  He said that after he followed for about an hour, the Jaguar stopped and that the Defendant left the car.  He said that he instructed the

Defendant to put his hands on the car and that the Defendant complied. He said that he smelled a strong odor of intoxicants on the Defendant and that the Defendant had glassy, bloodshot eyes and slurred speech. Officer Teal said that he had probable cause to believe the Defendant was under the influence of alcohol and that he helped the Defendant walk to the police car because he needed support.

Officer Teal testified that he smelled a strong odor of alcohol before he was close to the Defendant. He said he frisked the Defendant for weapons and called a DUI officer to assist. He said that the Defendant was unable to pronounce words properly and that he did not administer field sobriety tests because the Defendant was unable to stand. He said that after the Defendant was in the patrol car, he learned the Defendant was a former police officer. He said it was police policy to call a lieutenant when a former officer was involved in a crime. He said that the Defendant asked him to let him go around the corner and that he told the Defendant he could not allow that.

Officer Teal testified that it was apparent the car was not going to be driven and that the procedure was to inventory and tow the car. He said that Officer Smith performed the inventory but that he saw a bottle of gin on the front seat during the stop. He said he also saw a beer can in the console but did not know if it contained beer. He said he noted on his DUI report a strong odor of alcohol, glassy eyes, slurred and "mushmouth" speech, and extreme effects of an intoxicant. He said the Defendant told him that he had money as Officer Smith was conducting the inventory. Officer Teal said that only Officer Smith and Lieutenant Burton handled the money and that he was not present when it was counted. He said he transported the Defendant to where the DUI officer was going to perform the field sobriety tests and to the processing station, where the Defendant's belongings were inventoried. He agreed that officers found $543.47 on the Defendant's person.

On cross-examination, Officer Teal testified that the Defendant was illegally parked next to the curb on a residential street. He said that no signs indicated parking was prohibited in the area and that he did not ask the Defendant if he could make other arrangements for his car. He agreed that in the discretion of the officer, a stopped car could be left parked rather than being towed if it was legally parked and the officer obtained permission from the driver. He did not know why he testified earlier that the policy was to tow the cars.

Officer Teal testified that he knew he was accused of stealing money from the car and that fear of such accusations was the reason the police inventoried cars before towing them. He said that police policy was to give the tow truck driver the completed form of the car's contents. He said the $3500 in the trunk was tagged as evidence because it was proof that "something happened" and was different than property listed on a property receipt report. He said he did not personally record the amount of money on the property report because he

did not count the money. He said he did not know who completed the property report. He said he did not know who gave the property room the package of pills, rights waiver, DUI DVD, handgun, leather holster, or bottles.

Officer Teal testified that he followed the Defendant after he saw the Defendant drive in circles in the middle of the road and in the wrong lane. He did not know how many circles the Defendant completed but said it was more than one. He said he did not include the circles or the speeding in his report and only described the Defendant's disregarding a red light. He said the probable cause for reckless driving was that the Defendant entered the opposing lane of traffic.

Officer Teal testified that he learned two days before the trial that he was accused of stealing and that he told the Lieutenant about the circles on the day of the incident. He said he tried to give the Defendant field sobriety tests but could not because the Defendant could not stand. He said the probable cause to arrest the Defendant for DUI came from the Defendant's bloodshot eyes, slurred speech, and smell of alcohol. He said that after the Defendant was positioned with his hands on the car, he tried to perform a field sobriety test but that the Defendant could not remain standing and had to have help walking to the car. He said he placed the Defendant under arrest, handcuffed him, frisked him for weapons, and placed him in the patrol car. He agreed that he did not follow procedure by placing the Defendant under arrest before the DUI officer arrived. He agreed that policy was important when dealing with a former police officer but said it was within his discretion to handcuff the Defendant because he was alone. He said that it was police policy to call the DUI officer but that he made the arrest because he had probable cause to believe the Defendant was under the influence of alcohol.

Officer Teal testified that he was in his patrol car writing the arrest ticket when his partner, Officer Smith, inventoried the car and that he heard the Defendant say something about money in the trunk. Officer Teal reviewed the affidavit and said that Officer Smith located a sealed envelope and that Lieutenant Burton counted the money. He said that he did not have personal knowledge of the location of the money until Lieutenant Burton told him and that Officer Smith never showed him the evidence during the inventory. He said that he saw one open container in a cup holder in the console of the car and that his partner informed him of liquid in a bottle. He said that in order for him to complete the arrest ticket, his partner told him about the presence of gin, beer in an open container, a beer bottle on the floorboard, and money.

On redirect examination, Officer Teal testified that he had reasonable suspicion the Defendant was under the influence. He said that the DUI unit had a camera, a DVD player, a speaker, a Breathalyzer test, and a blood sample test but that his patrol car had none of

these. He said that he called the DUI unit to confirm his suspicions concerning the Defendant's intoxication. His affidavit stated that the Defendant drove in the opposite lane after disregarding the red light. He said that when he followed the car, it slowed as if it were about to stop but then made a complete turn in the street. He said it was standard procedure for multiple officers to contribute to an affidavit signed by one officer. He stated that he was the arresting officer but not the property officer and that the receipt would have been given to the property officer. On recross-examination, he said it was within his discretion to tow the car.

Memphis Police Officer Christopher Lee Smith testified that on March 7, 2009, Officer Teal called him to assist with a stop. He said that he could see the Defendant in the back of Officer Teal's patrol car but that he could not observe details. He did not talk to the Defendant or notice his eyes, odor, or vocal pattern. He said he learned from Officer Teal that the Defendant was intoxicated but did not reach his own conclusion. He said his responsibility was to inventory the Defendant's car because the Defendant was under arrest and the car was being towed. He said it would not have made sense to leave the car because it was the "fruit" of a crime. He said that it was not a safe area of town, that the car could have been broken into or "stripped," and that he would have been accountable. He said he inventoried the car to ensure the contents remained after it was towed. He said collecting evidence and securing the Defendant's property justified the inventory. Officer Smith said that when he was inventorying the car, Officer Teal was in his patrol car writing the report. He said that in the Defendant's car, he found one unopened bottle of beer, one empty bottle of beer, a bottle of gin, a cup in the center console, a Derringer in the back seat, and $3500 in a briefcase in the trunk. He said the Defendant informed him of the money.

Officer Smith testified that after Lieutenant Burton arrived, they counted the money in front of the Defendant and secured it. He said medication found in the car was noted on the reports. He said that the only name on the evidence receipt was Officer Teal's and that he was unsure who delivered the evidence. He said that the first items listed on the receipt were thirty-five $100 bills and that he saw them at the scene. He said the receipt noted a number of pills, a DUI DVD, which was a video recording of the scene that provided another perspective, and an EIG Derringer. He said that the receipt also mentioned one leather holster, two twenty-two-ounce bottles of Michelob Ultra, one being empty, and one partially full 750 milliliter bottle of New Amsterdam gin. He said he did not have any recollection of Officer Teal's handling the $3500. He said that the money would be seized during a DUI stop because it was a large amount and could disappear if left in the car and that they took it to property and evidence storage for security. He said that as they counted the money, a strong odor of alcohol came from the patrol car.

On cross-examination, Officer Smith testified that the $3500 was improperly

categorized as evidence rather than personal property. He said the other personal items were not classified as evidence. He did not know who classified the money as evidence. He said the evidence report did not have his identification number but would have if he had entered the property as evidence. He said that because Officer Teal's identification number was on the form, either Officer Teal took the evidence or someone else provided Officer Teal's number.

Officer Smith testified that he went to the scene at Officer Teal's request. He said he did not have any contact with the Defendant except when the money was counted. He said that he typically inventoried a car before towing it and that a car was towed when the driver was arrested. He said that Officer Teal had already arrested the Defendant when he arrived and that they called the DUI unit to confirm the Defendant was intoxicated and gather further supporting evidence. He said that the stop occurred along a residential street and that the Jaguar was near a house. He did not recall if other cars were parked on the street. He agreed the police policy reflected the Tennessee State Supreme Court's requirement that the police department allow a defendant the option to turn over his vehicle to a third party or to leave it legally parked. He said it also provided that if a defendant was too intoxicated to make a sound judgment, it was left to the officer's discretion. He reviewed the arrest report and said Officer Teal did not record his reasons for towing the car. He said that one of the reasons for having the car towed was liability but that there was a "vehicle hold harmless form" waiving liability. He said that if the officer determined the defendant lacked sound judgment, the officer would not give him or her the choice to leave the car. He said the reasons for towing should have been on the arrest ticket to avoid confusion.

Officer Smith testified that Officer Teal's report did not state the Defendant drove up and down the road or did doughnuts. He said the report mentioned the money and towing the car. He said that although the city did not have a towing company, it maintained a contract with several towing companies. He said that when inventorying the car, he collected all the items and took them to Officer Teal. He said that before he arrived, Officer Teal had seen the cup on the front seat. He said that the cup contained liquid with the coloring of beer but that he did not tag the cup as evidence or examine its contents. He did not know why the money but not the cup was collected as evidence. He said that when he arrived, the trunk was closed and the doors were unlocked. He did not know what occurred between the stop and his arrival.

Officer Smith testified that they placed the evidence on the hood of the car but did not remember if Officer Teal assisted in tagging the evidence. He did not remember if Officer Teal handled the money. He said that the money was in an envelope in a briefcase, that he did not remember if the envelope was sealed, that Officer Teal noted the money in his police report, and that he was uncertain who opened it. He said that Lieutenant Burton, not Officer

Teal, counted the money. He did not know what was done with the evidence. He said that the copies of the inventory sheet went with the tow truck driver and that although the officer usually kept a copy, he did not know its location.

On redirect examination, Officer Smith testified that he carried property and evidence bags, manilla folders, and small property tags. He said he had never removed liquid from a cup in a car and agreed an empty cup would not prove anything in court. He said that money and a pistol had no connection to driving under the influence and were personal items but that they were listed as evidence on the property receipt. He said the gin and beer bottles were on the passenger side of the car and were important to a DUI investigation because the driver could have been drinking.

On recross-examination, Officer Smith testified that time passed between when Officer Teal called him and when he arrived and that he did not know who put the bottles on the seat of the car. He said that a cup with liquid was evidence of DUI but that he did not collect it. He said that when he arrived, Officer Teal advised him the Defendant was being uncooperative. He agreed that if someone stole money from him, he would be upset.

Memphis Police Department Lieutenant Jessica Burton testified that when she arrived at the traffic stop, Officers Teal and Smith were with the Defendant. She said that the Defendant asked her to release him but that she refused. She said that a strong odor of alcohol came from the Defendant and the patrol car, that his eyes were glassy, and that he was talkative with slurred speech. She said that the Defendant told the officers about money in a briefcase in his car and that she counted the money in front of him to ensure it was correct. She said that the Defendant was in the patrol car when she counted the money and that he could see her counting it. She said that he did not disagree after she counted the money and that she did not remember his making accusations about the amount. She said he was irritated and agitated.

Lieutenant Burton testified that earlier in her career, she had been written up twice. One reprimand concerned a crash with her patrol car. The second concerned her approving an arrest ticket that the officer later changed. On cross-examination, Lieutenant Burton said she got into trouble in the police academy for changing a grade.

Lieutenant Burton testified that when she arrived on the scene, the car was being inventoried. She said the money was originally in a briefcase but did not recall whether it was in an envelope or who removed it. She said that all she remembered concerning the money was that it was $3500 and that she counted it in front of the Defendant. She did not recall his becoming angry about the amount of money. She said that he was not screaming, yelling, or cursing and that she was not there when the video recording was taken. She said

she was called to the scene because the Defendant was a former police officer. She did not recall if the Defendant told her about the money or if he told the officers before she arrived. She said that she did not know who touched the money first but that she saw it in the briefcase in the trunk of the car. She said that she had no control over how it was tagged because she left the scene and that it was the officers' responsibility. She said her purpose was to confirm that an officer was being arrested and to count the money. On redirect examination, Lieutenant Barton said that she was forty-six years old and that the incident with the grade at the police academy occurred when she was twenty-two or twenty-three.

Memphis Police Department Sergeant James Carson testified that in March 2009, he was a DUI officer who performed field sobriety tests on the scene of suspected DUIs, that he was called to the scene of the Defendant's traffic stop, and that they decided to move to a safer area. He knew the Defendant was a police officer. He identified the implied consent form he completed with the help of Officer Teal. He marked "moderate" concerning the odor of alcohol and drugs. He said he advised the Defendant of his rights at 3:45 a.m. and observed him. He said that the Defendant's eyes were bloodshot and that his attitude was argumentative and talkative. He said he noted the effects of alcohol were "obvious" because more than slight indicators of intoxication were present. He said the reason Officer Teal found the Defendant to be extremely intoxicated was because he had a better opportunity to observe him. He said the Defendant never performed the walk and turn or one-leg stand tests because he refused them and stayed in the car.

Sergeant Carson testified that the video recording depicted his setting up the location for the tests and reading the Defendant his rights. The DVD was played for the jury. On the recording, Sergeant Carson told the Defendant, "They have you under arrest," read the implied consent form, and read the Defendant his *Miranda* rights after the Defendant refused the tests. He said the video showed the Defendant's being argumentative and saying that the officers were "setting him up" and that he would sue them. He said the Defendant claimed they could not do a blood alcohol test more than twenty to thirty minutes after arresting him. Sergeant Carson said that no such policy existed and that it was not unusual or against policy to do a test two or three hours after a stop. He said that at the scene, he never heard the Defendant say he had been "robbed" of money or any discussion about money being taken from the Defendant.

On cross-examination, Sergeant Carson testified that the Defendant mentioned a woman as he was arguing in the car. He did not know how long it took him to arrive at the scene or whether the Lieutenant was still there when he arrived. He said it was police policy to call a DUI officer whenever there was a possible DUI. He said that normally the suspect was detained when he arrived and that he determined whether the suspect was too impaired to drive. He said that if an arrested suspect tested below the limit on a Breathalyzer, they

could "unarrest" him or her. He said the Defendant was angry but was coherent enough to understand his rights. He said the time of arrest was 1:30 a.m., which he said was the time of Officer Teal's decision to arrest the Defendant. He said the process was completed at 4:33 a.m. He said he gave the DVD to Officer Teal, who was responsible for turning in the DVD as evidence, and left the scene.

Sergeant Carson testified that the tests' purpose was to determine whether the Defendant could drive and that indicators alone determined this. He said he put "moderate" concerning the odor of alcohol based upon his observations. He said a spotlight pointed at the car allowed him to see the Defendant's eyes and agreed with Officer Teal that the Defendant's eyes were bloodshot but not that they were glassy. He said he did not notice speech impairment. He said that although he never saw the Defendant fall, he never saw the Defendant stand. He said he made his determination through the indicators taken together. He said he could not fully determine whether the Defendant was intoxicated from the short time they interacted. He advised the arresting officer that the effects of alcohol were obvious and that it was the arresting officer's responsibility to make the determination. On redirect examination, he said that in his opinion, the Defendant was obviously impaired.

Marilyn Dates, the Defendant's wife, testified for the defense that she saw the Defendant all day on March 6, 2009, and that he did not drink or seem intoxicated. She said he did not smell of alcohol, stumble, fall, or slur his speech. She said that he left at 9:00 p.m. to go to his brother's house and that when he left, he had not consumed any alcohol and did not show signs of intoxication. She said he arrived home the next day wearing the same clothes. She said that neither he nor his clothes smelled of alcohol but that he was angry and talked about the police stealing his money.

On cross-examination, Ms. Dates testified that she was a 9-1-1 dispatcher and that she did not work on Friday, March 6, 2009. She said that the Defendant's brother lived in Raleigh, Tennessee. She said that she saw the Defendant on March 7 at 3:00 p.m. and that from March 6 at 9:00 p.m. to March 7 at 3:00 p.m., she did not see the Defendant or know whether he was drinking. She agreed that she and the Defendant were "mutually dependent" and that it would not be good for her to say the Defendant had been drinking because it would support the State's case.

On redirect examination, Ms. Dates testified that if she knew the Defendant had been drinking all day, she would have told him to plead guilty. She said she would not make up something about the Defendant's actions.

Darryl Dates, the Defendant's brother, testified that on March 6, 2009, the Defendant arrived at his house between 10:00 and 10:30 p.m. and that the Defendant did not smell like

alcohol, did not appear to be impaired, and did not stumble or slur his speech. He said that he did not notice the Defendant's drinking alcohol and that he and his wife did not drink or use drugs. He said that when the Defendant arrived, they planned to go to a casino. He said that they drove separately to the casino and that he arrived around 11:30 p.m. He said that although they met in the parking lot and walked in together, they became separated. He said that when they walked into the casino, the Defendant did not appear to have had anything to drink, seem intoxicated, stumble, or slur his speech.

Mr. Dates testified that he did not see the Defendant drink alcohol or use drugs that evening and that the Defendant never appeared intoxicated. He said that he next spoke with the Defendant on March 7 when the Defendant called him from jail. He said he was surprised to hear about the circumstances. He said that although the Defendant was wearing the same clothes as the night before, he did not smell like alcohol. He said the Defendant was upset, disagreed with the amount of money counted during the inventory of the car, and told him that during the car ride, the officer placed some money into his front pocket.

On cross-examination, Mr. Dates testified that he did not know where the Defendant was during the day on March 6, 2009, and that they decided to go to the casino from his house. He said they left at the same time for the casino but drove separately. He agreed he was not watching the Defendant's car when they were traveling and did not know any stops the Defendant may have made. He agreed that free alcohol was provided at casinos and that he and his fianceé drank alcohol while at the casino. He said that although he did not see the Defendant drink alcohol, he did not see the Defendant the entire time. He said the affidavit included a typographical error where it said that he went to the Defendant's house. He said that he did not travel in the Defendant's Jaguar that night and that he did not know about any alcohol in the Defendant's car. He agreed that if the Defendant had been drinking on his way to the casino or after he left, he would not know about it. He said that because the Defendant was his brother, he could not come to court and testify that he saw the Defendant drinking that night, which would not help the Defendant, but that he would not lie, either. He said that there were times during the night when the Defendant was not in his sight and that the Defendant could have been drinking without his knowing.

On redirect examination, Mr. Dates testified that if he intended to lie for the Defendant's benefit, he would have claimed to have been with the Defendant until the Defendant was stopped. He said he met with defense counsel and swore to an affidavit stating essentially the same facts as his testimony in court. He said that he had a room in the casino's hotel that night and that the Defendant could have stayed with him if he had wanted. On recross-examination, Mr. Dates said that it was not odd that the Defendant left the casino but that it was odd he left without talking to him.

The Defendant testified that on March 6, 2009, he spent the day at his house with his wife and did not drink or use drugs. He said he went to his brother's house around 9:00 p.m. intending to go to the casino. He said that they went to the casino three or four times during the year and that he had money in a briefcase from a stock option payout. He said that the money was in a sealed envelope in his briefcase in the trunk. He said he arrived at his brother's house no later than 10:15 p.m. and did not use drugs or drink alcohol before they left in separate cars. He said he did not stop to purchase alcohol and did not drink in his car. He said he arrived at the casino no later than 11:15 p.m. and had not consumed alcohol or taken drugs. He said that he roamed the gambling machines and sat down to play but that his money became stuck in the machine, which took a long time to fix. He said he did not drink alcohol at the casino.

The Defendant testified that he left the casino and took several different paths because of heavy traffic, which agitated him, but that he did not stop anywhere to buy alcohol and did not drink or use drugs. He said he saw blue lights behind him as he was driving and tried to allow the emergency vehicle to pass. He said that he tried to pull over, that the traffic was too heavy, and that he turned left on the next street. He denied doing doughnuts in the road, making u-turns, circling around, and driving on a different road before stopping, and he said it would have been in the arrest ticket if he had. He said he had been a police officer for twenty years and knew the purpose of the arrest ticket was to report the events. He said that on the night he was stopped, he had not consumed any alcohol and did not have bottles of alcohol or a cup on the front seat of his car. He said he would not have bottles of alcohol on the front seat while driving because that would be a "stupid thing to do." He said that he had alcohol in the trunk from a previous social event but that it had not been opened. He said he kept the alcohol in his trunk to keep it from his seventeen-year-old son. He said that he placed the unopened bottle in his trunk but that he did not place the empty bottle in the trunk and did not drink the contents. He said he did not drink the gin from the gin bottle.

The Defendant testified that when he was stopped, the officer walked up and shined a flashlight in the car. He said that he showed the officer his hands to avoid threatening the officer, that the officer asked for his driver's license, and that he searched "a little compartment" in his car for it. He said that when he was searching in the compartment, he pulled out papers and a bag of vitamins. After he gave the officer his license, the officer motioned for him to exit the car. The Defendant returned the bag of vitamins to the compartment. He identified a photograph of the inside of his car and the compartment where the vitamins were located. He said that Officer Teal's account of his immediately exiting his vehicle was incorrect and that he did not place his hands on the top of his car. He said that after he left his car, he talked to the officer about his travels that evening. He said that the officer requested he sit in the back of his patrol car for a minute and that he walked to the patrol car without assistance. He said that before he got into the patrol car, the officer

-10-

touched him around his waist but did not handcuff him. He said that once he was in the back seat of the car, he could not leave. He said that the officer lifted the Defendant's bag of vitamins and looked at him, which indicated to the Defendant that he thought they were drugs.

The Defendant testified that the officer walked between the two cars, removed the keys from Defendant's car, and opened the trunk. He said that the officer looked through the trunk and that he could only see the officer's back. He said that he did not tell the officer about the money in the trunk and that the officer returned to the patrol car and asked if the pistol and the $3500 were the Defendant's. He said he told the officer the amount was $4000. He said the officer went to the passenger side and bent over as if to pick up something from the inside. He said that the officer appeared to place something in the Jaguar but that he did not know what it was.

The Defendant testified that he was irritated because the amount of money quoted by the officer was too low. He said that he used profanities in demanding his money and that Officer Smith arrived at that point. He said Officer Smith looked through the car and brought Officer Teal the contents of the trunk. He said that Officer Smith never came close to the Defendant and that Officer Smith handed the items through the window. The Defendant asked why he was stopped. He said Officer Teal began counting the money to him while Officer Smith continued looking through the car. He said that when Officer Teal counted $3500, the Defendant again demanded the return of his money and threatened litigation if the money was not returned. He said that the officers found a bottle of prescription pills in the car and that he was worried because he thought the officers believed he was a drug dealer. He said the officers did not know he was a former police officer. He said the officers did not tell him he was under arrest for a DUI or mention towing the car.

The Defendant testified that cars were parked on the opposite side of the road but not on his side of the road. He said that he was legally parked and that he drove to that street to be out of traffic. He said he did not think he was under arrest because he thought they would realize the items in the car were his personal effects. He said that the Lieutenant arrived and that he thought she would help resolve the situation. He said that although he did not know of a policy requiring an officer to call a supervisor when a suspect was a former police officer, he knew that it was policy to call a supervisor when money was involved. He said that when the Lieutenant arrived, Officer Teal talked with her and handed her the money as she approached the car. He said that she counted $3500 and that he told her he had more money than she counted. He said that she returned the money to Officer Teal and that they handcuffed him. He said that in his experience as a police officer, money was seized only if drugs were involved, not during a DUI arrest. He said he was irate because he did not have his money and thought he was being "set up."

The Defendant testified that they moved to a location where a DUI officer was waiting and making a video recording. He said that he had never seen himself get as mad as he was in the video but that $500 was a large amount of money and that he was not working at the time. He said that when the DUI officer arrived, he thought he was under arrest. He said he had never seen an inventory list of his car.

The Defendant testified that the DUI officer approached the car, told him that he was under arrest, and asked if he wanted to take a DUI test. He said he declined the test because he was already under arrest and did not feel he needed to take another test. He said he knew the DUI officer was not going to release him because the officers had arrested him already. He thought that Officer Teal believed the arrest was for drugs and would not have released him even if he had passed a DUI test. He said that the officer collected the prescription pills and $3500 as evidence, which was protocol for a drug arrest but not a DUI. He said he did not feel he had any choice about taking the Breathalyzer test because he was already handcuffed.

The Defendant testified that on the ride to the police station, Officer Teal pulled over, opened the passenger-side door, and placed money his shirt pocket. He said that once they arrived at the police station, the officers removed his personal items from him, including $500 from his shirt pocket where he claimed Officer Teal placed the money and about $43 from a black pouch he carried. He said that his brother, Daryl Dates, picked him up from the jail and that he returned to get his car. He identified the property receipt, which stated that he received $543.47, several other items from his black pouch, and his clothes upon release. He identified the check that was later issued to him for the money that was collected as evidence. He said that on counsel's advice, he did not report Officer Teal to internal affairs before the trial. He said that he did not alter the documents and that they came directly from Shelby County.

On cross-examination, the Defendant testified that the arrest ticket reflected that he was charged with disregarding a red light, driving under the influence, possession of a handgun while under the influence, public intoxication, reckless driving, and refusing to submit to a blood alcohol content test. He agreed alcohol was in his trunk but said none was on the front seat. He said that testifying that alcohol was on the seat would hurt his case because if he had been drinking and drove under the influence, there would be a legitimate basis for an arrest.

The Defendant testified that the arrest and events of the night did not occur as they were recounted in the affidavits. When asked if the officers fabricated their account, he said "[O]ne officer always backs up another. There's no such thing as going against another officer." He said that he had $4000 in his briefcase and that when the officers told him they

counted $3500, he knew it was incorrect. He agreed the officers counted $3500 and said the $3500 was returned to him. He said that an additional $543.47 was on his person because Officer Teal placed money in his pocket and that this money was returned to him also. He acknowledged that $4000 was returned to him and that he did not lose any money. He said his briefcase was where he left it in the car.

The Defendant testified that he cooperated when Officer Teal asked him to sit in the patrol car. He said that although Officer Teal found the bag of vitamins and showed it to him, he was not charged with drug possession. He said that he knew Officer Teal had removed his keys because the lights turned off and that Officer Teal opened and searched his trunk. He said he saw Officer Teal move something from his trunk to the passenger's side of the car but did not know what the officer did. He said he did not know why Officer Teal stopped him. He said that he did not tell the officers he was a former police officer but that when Lieutenant Burton arrived at the scene, she knew him. He said he complained of the money being insufficient to Lieutenant Burton and Officer Smith. When asked if he was in a "threatening mode" on the video recording, he acknowledged he was upset. He said that he watched the video and that Sergeant Carson was polite and trying to do his job. He said that Sergeant Carson read him the implied consent law and that he refused to take any tests. He said that even if the tests showed he had no alcohol in his system, he still would have gone to jail.

On redirect examination, the Defendant testified that counsel had advised him to tell the truth. He agreed that if he had been intoxicated, he would not have taken the case to trial. He said that if he stopped a suspect for DUI, he would not search the suspect's car or steal money. He said that Officer Teal was the arresting officer and had discretion at the scene and that the other officers supported Officer Teal's decision to arrest. He said Sergeant Carson did not smell much alcohol from the car and did not agree with everything Officer Teal said. He said that although the money was no longer missing, he was upset because the money had been missing, not because he was drunk.

The jury convicted the Defendant of DUI and acquitted him of reckless driving and possession of a handgun while under the influence. The trial court found that the Defendant violated the implied consent law. The trial court sentenced the Defendant to eleven months, twenty-nine days, with forty-eight hours to serve. This appeal followed.

# I

The Defendant contends that the police lacked reasonable suspicion for the stop. The State contends that the issue is waived because it was not raised in a pretrial motion to suppress. We agree with the State.

The Defendant argues that although the issue was not raised in a motion to suppress, this court should consider the issue because the jury's verdicts for the charges of reckless driving and possession of a handgun while intoxicated demonstrate that it discredited Officer Teal's trial testimony. He argues that if Officer Teal's testimony is discredited, the evidence fails to show that a reasonable suspicion existed for the stop that led to the Defendant's arrest.

A motion to suppress evidence must be raised before the trial. Tenn. R. Crim. P. 12(b)(2)(C). Unless good cause is shown, a defendant waives a request for suppression of evidence if the issue was not raised in a pretrial motion. Tenn. R. Crim. P. 12(f). The Defendant has not addressed Rule 12 directly, but he argues that this court should consider the suppression issue pursuant to Tennessee Rule of Appellate Procedure 13(c). Rule 13(c) states that an appellate court "may consider those facts established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to Rule 14 [consideration of post-judgment facts]." Rule 13(c) addresses an appellate court's consideration of "facts in addition to those established by the evidence in the trial court." T.R.A.P. 13, Advisory Comm'n Cmts.

The Defendant asks this court to consider facts he argues were established by the jury's verdict in the trial court, but Rule 13(c) does not authorize an appellate court to consider an otherwise-waived suppression issue based upon a jury's factual findings. We conclude that the Defendant waived the issue of reasonable suspicion for the stop by failing to raise it in a pretrial motion to suppress. He is not entitled to relief on this basis.

# II

The Defendant contends that the evidence is insufficient to justify his DUI conviction. The State contends that the evidence was sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all

reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

It is unlawful for any person to drive a car on any public road and highway while under the influence of an intoxicant that impairs the driver's ability to operate the car safely. *See* T.C.A. § 55-10-401(1). In a light most favorable to the State, the record shows that the Defendant was stopped after running a red light, driving in circles on the highway, and driving in the lane of oncoming traffic. During the stop, the Defendant smelled of alcohol, slurred his speech, walked unsteadily, had glassy, bloodshot eyes, and was argumentative. While inventorying the car, officers found bottles of alcohol, including an empty bottle of beer and a half-empty bottle of gin. The Defendant refused to take a breathalyzer test. The evidence is sufficient to support the Defendant's conviction for DUI.

In reaching this conclusion, we have rejected the Defendant's argument that he is entitled to relief because the verdicts are inconsistent. He argues that the jury used the same evidence to convict him of DUI and acquit him of reckless driving and possession of a handgun while under the influence. The State contends that inconsistent verdicts do not entitle the Defendant to a new trial. We agree with the State.

"Consistency in the verdicts is not necessary as each count of an indictment is to be regarded as a separate incident." *State v. Wiggins*, 498 S.W.2d 92, 93 (Tenn. 1973). "This court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes the guilt of the offense upon which the conviction has returned." *Id.* at 94. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE